UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,                                         Case No. 2:23CR20672-001

v.                                                   Hon. Terrence G. Berg

ABIGAIL WEXLER,

    Defendant.
_____/

## DEFENDANT'S SENTENCING MEMORNADUM

Subject to the Rule 11 Plea Agreement, Defendant Abigail Wexler plead guilty to Counts 1 and 2 of the Information, Introduction of Misbranded Drug into Interstate Commerce.[1] This memorandum is submitted to provide information about the events that resulted in the instant conviction, and to argue for the Court to sentence her to a term of probation.

### I. INTRODUCTION

Abigail Wexler is a 27-year-old transgender woman (born male, identifies as female) that uses she/her pronouns. Ms. Wexler's pre-sentence investigation report (PSIR) provides a thorough accounting of her personal and family data; physical condition; mental and emotional health; adverse childhood experiences; substance use/abuse; educational and employment background; and financial condition. That information is not being contested by Ms. Wexler and it will not be reiterated here; rather, this memorandum endeavors to provide context for Ms. Wexler's actions.

#### a. DEFENDANT'S EXPLANATION FOR HER ACTIONS

Ms. Wexler began her transition in 2018 when she was approximately 20 years old. She had known for years that she identified as female, and she felt the pressure to embark on her

---

[1] 21 U.S.C. § 331(a) and 21 U.S.C. § 333(a)(1)

transition as she noticed her body masculinizing more and more each year. She worried if she waited too long, she would be unable to pass for and be accepted as a female in the future. At the time, she was living with her parents and still on their health insurance plan, so she feared seeking treatment through official means—not that there was an abundance of clinicians in her area of Tennessee. Initially, she relied on "grey market"[2] pharmaceuticals to begin her transition. In 2019, she started seeing a therapist that referred her to an endocrinologist to continue her transition, but that clinician had little experience with transgender patients, so she was referred to an endocrinologist with more expertise.

With the new endocrinologist, she was prescribed injectable forms of Hormone Replacement Therapy (HRT), which proved to be more efficient means of administering the drugs she needed to transition. However, the more specialized drugs were expensive and often not covered by insurance, so she began to compound her own drugs. She obtained the active pharmaceutical ingredients (APIs) from China and spent a year researching about compounding and methods of sterilization. Utilizing the robust transgender community online that she had become enmeshed in, she consulted with chemists and laboratory workers that had specialized knowledge in compounding and sterilization. She sent the APIs that she received from China to labs for testing to ensure their purity and safety. Eventually, she began using the drugs on herself— she was happy with the results and suffered no adverse side effects.

She states that before she began her transition, she was consistently suicidal as a teen, never feeling quite at home in her body, but now, she feels a genuine comfort with who she is. By this time, she had moved out of her parents' home and was living in a house with other transgender people that had come from similar circumstances—unable to stay with their parents because of

---

[2] Referring to the sale of goods by unauthorized dealers

their lifestyle, unable to obtain hormone drugs to facilitate their transition, and desperate to begin the process for fear of missing the opportunity to utilize the drugs at a younger age when they would be more effective—so Ms. Wexler began sharing the drugs with her housemates.

Throughout the time she was utilizing the treatments on herself and her housemates, she and those in her household using the treatments were careful to monitor the effectiveness through frequent blood testing. By 2021, her friends had told other friends, and she was being sought out for her "home brewed" hormone replacement drugs. Originally, she was providing the treatments for free because she wanted to help others in need, but eventually, she started charging enough money to cover her expenses. Based on her communications with people in the community, online and locally, Ms. Wexler estimates that there are tens of thousands of people seeking HRT treatment because they are unable to secure the treatments on their own.

As the demand for her home-brewed HRT increased, Ms. Wexler was being sought out as a person that was very knowledgeable in the field. She engaged with those that purchased her HRT, always making sure that she was spending time communicating with them to ascertain their intentions with using the treatments, providing guidance to ensure proper usage, and getting feedback on their results. She states that she frequently denied assistance to those that seemed hesitant about the consequences and ramifications of taking HRT. In the time that she supplied HRT to the transgender community, thankfully, she was never informed about adverse effects or injuries from her therapies. On the other hand, she communicated with multiple customers that described how the treatments they received changed their lives. They recounted how they struggled with mental health issues—some even struggling with suicidal ideation—because of their inability to obtain HRT treatment. After receiving HRT from Ms. Wexler, they were effusive in their

gratitude, crediting her with saving their lives. This feedback buoyed Ms. Wexler, giving her the feeling that she was doing good for her community.

Throughout this process, she reinvested the money she made from selling HRT in newer and better equipment for compounding and sterilization. She made guides to educate customers about using the products. She communicated with the community frequently to get feedback about their treatments and provide advice based on her own experiences. She was contacted by people from other countries, places where being transgender and seeking treatment would not only result in legal ramifications, but possible violence. Some of these customers asked her to send the HRT treatments in innocuous packaging to avoid detection from local authorities. She obliged, reasoning that she was doing good for these people.

From the initial vetting of customers through online messaging, to making sure they understood the potential side effects and possibility of adverse reactions, to the guides that provided information about proper use, to the follow ups she did with customers that had received her treatments, she believed that she was doing more harm than good. She thought that she was providing a service where there was a clear deficiency in the provision of healthcare desperately needed by those that became her customers. She thought that her customers were approaching the treatments with full information about use and consequence, and they were making their own decisions about using her products.

When everything came crashing down and her home was raided, eventually leading to federal charges and the instant convictions, the reality of her actions became apparent. When she learned that her products got into the hands of a 15-year-old boy in California she felt horrible. Though she felt satisfaction about the people she helped, she felt immense remorse about the people that might have been adversely affected by her treatments.

In reflecting on her actions, she believes that the institutional healthcare organizations were not equipped to provide care to a burgeoning transgender community, and she looks back on her time providing HRT as the most fulfilling thing that she has ever done, but she understands that the way she provided assistance was misguided and dangerous. Looking into the future, she is happy that she found her passion. If the instant convictions do not create a hinderance, she hopes to go back to school for endocrinology, so she can continue to help people in the transgender community through legal and official means, knowing that she can approach potential patients as a person who has gone through what they are going through, and someone that has extensive practical experience.

## II. ARGUMENT FOR A PROBATIONARY SENTENCE

Defense counsel herein advocates for a probationary sentence and argues that such a sentence is supported by an analysis of the circumstances of the offense and the history and characteristics of the defendant, as well as the other § 3553(a) factors analyzed herein.

### a. ANALYSIS OF § 3553(a) FACTORS

#### i. the nature and circumstances of the offense and the history and characteristics of the defendant;

Ms. Wexler is not a typical offender—she has no prior criminal record, and she is diagnosed with gender dysphoria, generalized anxiety disorder, depression, and post-traumatic stress disorder. She is receiving mental health treatment through Pure Psychiatry of Michigan and taking medication as prescribed for anxiety.

As described above, Ms. Wexler's actions were driven by an altruistic—albeit naïve—desire: to provide other transgender persons a means through which they can obtain hormones necessary for their transition that they could not obtain on their own. Even though she is grateful for the people that praised her for her assistance, she dreads the thought that there were others that

were harmed that she does not know about. She has learned immensely from this experience, and she will never again put herself in a position where she is illegally providing regulated drugs. As a result, a probationary sentence is justified for this Defendant.

> ii. **the need for the sentence imposed—to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;**

There is no doubt that a custodial sentence could be sufficient to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment, but the crucial question is whether a term of incarceration is *greater than necessary* to accomplish these goals as it relates to this Defendant. Defense counsel argues that a probationary term would be sufficient to reflect the seriousness of the offense and provide a just punishment.

As outlined above, Ms. Wexler was driven by a desire to provide hormone therapy to transgender persons that were unable to obtain care through typical means, or who were not able to afford the medication they had been prescribed. Her methods were misguided, and she recognizes that she failed to consider all of the potential negative consequences if her medications were taken incorrectly, if the end user suffered an adverse reaction, or if her products ended up in the hands of a minor, but she has accepted the consequences of her actions and vows to never find herself on the wrong side of the law again.

> iii. **the need for the sentence imposed—to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant;**

The question of deterrence of future criminal conduct in this matter requires consideration of two types of deterrence—general deterrence and specific deterrence.

Regarding general deterrence, a probationary sentence with appropriate sanctions would be effective to send a message to other would-be offenders. As outlined below and in the PSIR,

there is insufficient number of defendants whose primary guideline was §2N2.1 with a Final Offense Level of 2 and a Criminal History Category of I to make an apples-to-apples comparison. However, there were a total of 74 defendants whose primary guideline was §2N2.1 and who had a Final Offense Level of 4 and a Criminal History Category of I. Of those 74 defendants, only 15 defendants (20%) received a sentence of imprisonment, and the average length of imprisonment imposed was 3 month(s) and the median length of imprisonment imposed was 1 month(s). With that said, a probationary sentence in the instant matter would be in line with the majority of similarly situated defendants with *higher* Final Offense Levels.

Regarding specific deterrence, the Court must impose a sentence that is sufficient, but not greater than necessary to deter Ms. Wexler from committing such acts in the future. To be sure, the present convictions have sent a strong message to Ms. Wexler about her actions, and through a probationary sentence, she will have to prove to the court that she can comply with the sanctions imposed and remain in the good graces of the law. Moreover, she will have criminal convictions that must be disclosed throughout her future endeavors, which will serve as a lasting reminder of her lapse in judgement that led to the instant convictions.

Additionally, Defense counsel urges the Court to forgo a requirement for Defendant to participate in the Computer/Internet Monitoring Program (CIMP) as mentioned in the PSIR. Apparently, participation in the CIMP program is implicated because Ms. Wexler used computer systems to communicate with end users of her hormone products. However, she used the computer as a communication tool, in the same manner that she used the US Postal Service as a delivery mechanism. As a general matter, computer systems have a wide variety of applications beyond messaging or communication with other users, so defense counsel is concerned that participation in the CIMP program will hamper Ms. Wexler's ability to conduct normal day-to-day tasks if she

is prohibited from using the devices that have become integral to American life. Furthermore, Ms. Wexler has a degree in computer science, so participation in the CIMP program may limit her ability to be marketable for employment in the field in which she possesses a degree.

> iv. **the need for the sentence imposed—to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner**

The next factor questions whether necessary treatment and rehabilitative services can be delivered in the prison setting, but the more relevant question is whether any required educational or vocational training, medical or mental health care, or other correctional treatment can be appropriately delivered in the community setting.

To the extent that substance abuse and mental health services are appropriate in the instant matter, such services would be best delivered in the community setting. The PSIR notes that Defendant disclosed mental health challenges stemming from early childhood sexual abuse, feelings of rejection by family and peers due to her transgender identity, and the associated efforts to suppress her transgender identity due to family beliefs. That being said, Ms. Wexler would be best served to receive treatment from a clinician that she is comfortable with and who has extensive experience with transgender persons—such a clinician would be readily available in the community setting, but she would have to accept whatever clinician was available in the carceral setting regardless of their experience in such matters.

Regarding substance abuse, Ms. Wexler disclosed limited use of alcohol and one time use of cannabis. She also disclosed recreational use of psychedelic drugs (e.g. acid, molly, 2CP). The PSIR does note that United States Customs and Border Patrol agents seized heroin that was supposed to be shipped to the Defendant in 2019, but Defendant vehemently denies that this drug was ordered by her, and she only learned about that incident when she read the PSIR in this case.

She states that she believes that her former roommate ordered the drug and used her name as the recipient, because she knows he was struggling with addiction at the time. Moreover, Defendant states that she is deterred from experimenting with hard drugs because she lost a close friend in high school due to drug abuse and her brother suffered from a serious drug addiction.

Lastly, this writer must express his concern about Defendant's safety in the prison setting. Currently, the Bureau of Prisons policy states that "[i]n deciding whether to assign a transgender . . . inmate to a facility for male or female inmates . . . the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems."[3] Such a policy provides no certain guarantee that Ms. Wexler would be placed in a female facility. Certainly, if Ms. Wexler was placed in a male facility, her safety and well-being would in jeopardy. Conversely, if Ms. Wexler were sentenced to a term of probation and allowed to remain in the community setting, her compliance and progress would be routinely monitored by her probation agent, and incarceration could still be utilized if she were to violate the terms of her probation.

### v. the kinds of sentences available;

Sentencing guidelines for the instant offense are zero to six months with counts 1 and 2 classified as Class A Misdemeanors, with a maximum statutory penalty of 12 months custody, followed by up to one year of supervised release per each count.

For these reasons and others stated elsewhere in this memorandum, the Defendant advocates for a probationary sentence with appropriate conditions and treatment or counseling programs as directed by her probation officer.

---

[3] https://www.bop.gov/policy/progstat/5200-08-cn-1.pdf

>       vi. **the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;**

As stated throughout this memorandum, the Defendant is advocating for a probationary sentence with other appropriate conditions. The Defendant contends that such a sentence would not create unwarranted disparities among similarly situated defendants.

As stated previously, there are not enough examples of offenders whose primary guideline was §2N2.1 with a Final Offense Level of 2 and a Criminal History Category of I to make a direct comparison. However, an examination of offenders with a Final Offense Level of 4 and a Criminal History Category of I shows that 80% of such offenders do not receive a sentence of imprisonment, and of those who do, the average length of imprisonment imposed was 3 month(s) and the median length of imprisonment imposed was 1 month(s).[4] This being the case, a probationary sentence in the instant matter would not cause a disparity among similar offenders.

>       vii. **the need to provide restitution to any victims of the offense.**

Restitution is not applicable in the instant offense.

### b. § 3553(a) CONCLUSION

Based on the preceding considerations, Defendant asserts that a probationary sentence with appropriate conditions and treatment or counseling programs can be sufficient, but not greater than necessary to meet the goals of § 3553(a).

## III. ADDITIONAL SENTENCING CONSIDERATIONS

It should be noted that when Defendant received the target letter informing her of the charges against her that resulted in the current convictions, without hesitation she informed defense counsel that she wanted to cooperate with the investigation. Subsequently, defense counsel and

---

[4] https://www.ussc.gov/guidelines/judiciary-sentencing-information

Defendant met with the Assistant US Attorney assigned to the matter, as well as investigators from the FDA. At the meeting, Ms. Wexler was open and honest about her actions, methods, and motivation for committing these crimes. As a result, Defendant has received a two-level reduction for acceptance of responsibility.[5] Furthermore, Ms. Wexler has been in compliance with all conditions of her pretrial release.

Additionally, there is a concern regarding some of the computers and electronic devices agreed to be forfeited in this matter. While Defendant is not contesting the forfeiture, she is requesting the opportunity to retrieve photos and videos of sentimental value from these devices. This matter was broached with multiple US Attorneys working on this matter, and there was an indication from that the request could be facilitated, but there has been no movement on this issue.

IV. **SUMMARY AND CONCLUSION**

Defendant appears before the court after being convicted of two misdemeanor offenses without a prior history of criminal activity. Her actions in this matter were driven by a desire to help people that were in a similar situation to her. She knows that she should have made different choices, and she knows that things could have ended up worse for her clients, but she is prepared to accept responsibility for her actions and hopes to be sentenced to a term of probation.

                                                            _____
                                                            Zachary Glaza
                                                            Counsel for the Defendant

---

[5] USSG §3E1.1(a).